ELLSWORTH EVARTS,

           Plaintiff,

v.

QUINNIPIAC UNIVERSITY,

           Defendants.

Civil Action No.
No. 3:15-cv-1509 (CSH)

**OCTOBER 4, 2018**

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. 33]

**HAIGHT, Senior District Judge:**

## I. INTRODUCTION

Plaintiff Ellsworth Evarts, a Public Safety Officer, brings this civil action against his employer, defendant Quinnipiac University ("Quinnipiac") alleging that it violated his rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.*, and the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, when it discriminated against him based upon a physical disability.[1] In his Complaint, he alleges that from January 24, 2014, to June 28, 2014, Quinnipiac failed to "afford [him] reasonable accomodation [sic]" for his disability. Doc. 1, ¶¶ 7, 9.

In particular, Plaintiff alleges that Quinnipiac "sent [him] home" rather than accommodating him; and after back surgery "refused to [allow him] to return to work even after [his] surgeon

---

[1] The Court notes that Plaintiff commenced this action with a *pro se* complaint by filling out a standard court form entitled "Complaint for Employment Discrimination." Doc. 1 (filed 10/16/2015). He later hired an attorney to represent him. *See* Doc. 14 ("Notice of Appearance" by James F. Sullivan on behalf of Ellsworth Evarts, 9/9/2016). Attorney Sullivan filed the opposition papers pertaining to the pending motion at issue.

released [him] for duty."[2] *Id.*, ¶ 7. *See also* Doc. 16, at 2 (III.A.). According to Plaintiff, Quinnipiac also "insisted [his] FMLA [benefits] had expired in an attempt to vacate [him]" or place him on vacation. Doc. 1, ¶ 7.

Plaintiff subsequently filed charges with the Equal Employment Opportunity Commission ("EEOC") and received a "Notice of Right to Sue" letter on or about July 21, 2015. *Id.*, ¶¶ 10-11; *id.*, at 7 ("Dismissal and Notice of Rights," dated 7/17/2015). Plaintiff alleges that he has the necessary documentation to show that the alleged discrimination occurred. *Id.*, ¶ 12. In his prayer for relief, Plaintiff seeks "backpay" and "[m]onetary damages," which he describes as "lost wages" and "retirement benefits." *Id.*, at 4-5. He also demands a trial by jury. *Id.*, at 5.

Extensive discovery in the case has been completed. Quinnipiac has now filed a "Motion for Summary Judgment" pursuant to Federal Rule of Civil Procedure 56(a), asserting that, with respect to both claims, there is no genuine dispute as to any material fact and Quinnipiac is entitled to judgment as a matter of law. Plaintiff, resisting that motion, contends that the record demonstrates the existence of factual issues which preclude summary disposition. This Ruling resolves the motion.

## II. STANDARD FOR SUMMARY JUDGMENT

The Second Circuit has repeatedly declared that, pursuant to Rule 56(a), Fed. R. Civ. P., "[s]ummary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir.

---

[2] It is undisputed that the date upon which Plaintiff returned to work as a Public Safety Officer for Quinnipiac after his back surgery was June 28, 2014. Doc. 16, at 3 (IV.1.-2.).

2016).[3]  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In deciding whether to award summary judgment, the court "constru[es] the evidence in the light most favorable to the [nonmoving party]' and 'draw[s] all reasonable inferences and resolv[es] all ambiguities in [its] favor.'" *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)).  "[A] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

Under Rule 56(a), the moving party bears the initial burden of demonstrating that no genuine issue exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).  Then, if the movant succeeds in carrying its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

---

[3]  Rule 56(a), captioned "Motion for Summary Judgment or Partial Summary Judgment," provides:

> A party may move for summary judgment, identifying each claim or defense  –  or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). *See also Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016). Instead, a party asserting that a fact is genuinely disputed "must support the assertion" by citing to the record or showing that "the materials cited do not establish the absence . . . of a genuine dispute." *Torres v. City of New York*, No. 09 CIV. 9357 (LGS), 2017 WL 2191601, at *1 (S.D.N.Y. May 17, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A)-(B)). "'[C]onclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Golino v. City of New Haven*, 761 F. Supp. 962, 965 (D. Conn.1991) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980)).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995)). Conversely, if the non-moving party fails to submit proof concerning an essential element of its case, summary judgment is warranted. *Celotex Corp.*, 477 U.S. at 323.[4]

In sum, the ultimate test "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

---

[4] On summary judgment, "a court must not 'weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.'" *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996)).

genuine issue for trial." *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

With respect to employment discrimination claims, "[t]he Second Circuit has cautioned district courts that they must be 'particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 636 (D. Conn. 2005) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)). However, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), because "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110.

## III.  FACTS

From the Local Rule 56(a)(1) Statements of the Parties [Doc. 33-5 and Doc.40-18], the Court discerns the following undisputed facts.[5]

---

[5] The Court cites only one paragraph number for both "Statements of Fact" [Doc. 33-5 & 40-18] because the numbered paragraphs in the two statements necessarily correspond to each other. *See* D. Conn. L. Civ. R. 56(a) (mandating that opposing papers on summary judgment include a Local Rule 56(a)2 Statement with numbered paragraphs corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement). The undisputed facts recited in Part III. are derived from and cited to the parties' statements.

Also, certain  internal and lateral citations appearing in the parties's statements of fact are omitted in the Court's citations herein.  They may be found in the parties' statements on the Court's case docket at Doc. 33-5 and Doc. 40-18.

In January of 2006, Quinnipiac hired Plaintiff as a full-time security officer and assigned him to the night shift with responsibility for covering entry points, typically Gate 1, the booth at the New Road entrance to Quinnipiac's campus in Hamden, Connecticut. Doc. 33-5 & 40-18, ¶ 1. In that position, Plaintiff was responsible for directing traffic, stopping vehicles as they entered campus, checking individuals' IDs coming onto campus, confirming that visitors had passes, directing drivers to the correct parking lot, and dealing with issues on student transport buses. *Id.*, ¶ 2. After Plaintiff worked for almost eight years at night at Gate 1, Quinnipiac reassigned him to Gate 3, located at the Mount Carmel Avenue entrance to campus, where he performed essentially the same duties he had performed at Gate 1. *Id.*, ¶ 3. A few months after his switch to Gate 3, Plaintiff successfully applied to fill an opening on the day shift for Gate 3. *Id*.

In August 2013, Quinnipiac began assigning Plaintiff to cover a security desk at the soon-to-open medical school on the North Haven campus. *Id.*, ¶ 4. At that location, he was responsible for checking IDs, issuing key cards, monitoring the coming and goings of construction workers on site, and responding to emergencies. *Id*.

In June of 2013, a couple of months before Plaintiff began working primarily at the North Haven campus, he tripped over a floor mat while walking to punch out at the conclusion of his shift, fell, and suffered a cervical injury. Doc. 33-5 & 40-18, ¶ 5; *see also* Doc. 33-1, at 6 (citing Evarts Dep., at 93-94, 96-97, 99-100).[6] When Plaintiff returned to work after a brief absence, he worked on "regular duty" per a medical note issued by Yale-New Haven Hospital Occupational Health Plus. Doc. 33-5 & 40-18, ¶ 5; *see also* Doc. 33-4 (Affidavit of Nicole Lambusta ("Lambusta Aff.")), ¶ 3,

---

[6] Evarts's deposition testimony, cited throughout as "Evarts Dep.," may be found at Tab A of Doc. 33-2, pages 5 to 42, and Exhibit B of Doc. 40-3, pages 1 to 39.

Ex. 1.  He pursued a workers' compensation claim and brought a civil suit against MagnaKleen, the company responsible for installing and servicing the rug; that suit settled for $275,000.00.  Doc. 33-5 & 40-18, ¶ 6;  Evarts  Dep. at 97-99, Doc. 33-2, at 49-53 (Evarts Dep., Ex. H).

Plaintiff worked at Gate 1 on January 10, 11, 16, 17, 20, and 21, 2014.  Doc. 33-5 & 40-18, ¶ 7.  Then, on January 23, 2014, several months after his June 2013 injury, Plaintiff sent an email to Sam Cotto, then Assistant Chief of the Department of Public Safety, reporting a series of back, neck, knee, and shoulder issues he was experiencing.  He also stated that although he was scheduled to work at Gate 1 for the next two days, he was unable to direct traffic.  *Id.*, ¶ 8.   The text of that email stated:

> Chief,
>
> I'm on Gate One for the next two day shifts. As I said in the past I have no problem with working the Gate but I can not direct traffic due to my injuries. Along with the back and neck issues my right knee and shoulder are giving out as I now have to rely on my right side for mobility causing my knee to give out and severe pain in the right shoulder. My Doctor told me my gates are in bad shape because of the Disc C-3 in my neck is crushing the spinal cord up there. I have another appointment on the 28th of January and the 5th of February to schedule the surgery. I'll keep you posted.
>
> Thanks,
> 027

Doc. 33-2, at 54  (Evarts Dep, Ex. I).

The following day, Assistant Chief Cotto assigned Evarts to Gate 2, near the admissions building, because that gate had no traffic-directing duties. Doc. 33-5 & 40-18, ¶ 9;  Evarts Dep., at 119.  In response to Plaintiff's suggestions in his email to Cotto that he was not physically capable of performing the full range of tasks associated with his position, Nicole Lambusta, then Quinnipiac's Human Resources Business Partner, directed Plaintiff's immediate supervisor, Sergeant

Jim Moniello, to send Plaintiff home until such time as he provided a new medical note updating his condition.[7]  Doc. 33-5 & 40-18, ¶ 10;  Evarts Dep., at 119-20; Doc. 33-4 (Lambusta Aff.), ¶¶ 4, 5. Later that day, Plaintiff consulted with his physician, Gary Bloomgarden, M.D., by phone. Doc. 33-5 & 40-18, ¶ 12.  Dr. Bloomgarden issued Plaintiff an "Out Of Work Note," which pronounced him "unable to return to work … until further notice." *Id.*

Two days later, on January 26, 2014, Plaintiff forwarded Bloomgarden's note to Lambusta by email.  Doc. 33-5 & 40-18, ¶ 13;  Doc. 33-2, at 55 (Evarts Dep., Ex. J).  In that email, he also expressed a complaint that he had "requested reasonable accommodations to perform [his] duties on Friday the 24th of January," but instead had been sent home.  Doc. 33-5 & 40-18*,* ¶ 13.  Evarts pointed out that he had previously been released to full duty by his physicians with the understanding that he was assigned exclusively to a sedentary desk job at the medical school. *Id.*  His email further stated:

> Recently I was taken out of the Medical School and placed in gate positions at Mt. Carmel that required standing, walking, twisting directing traffic and had to walk greater distances to use the facilities, so I asked for reasonable accommodations. I let Chief Cotto know that I could work the gate but could not direct traffic.

Doc. 33-2, at 55 (Evarts Dep., Ex. J).

Lambusta replied on Tuesday, January 28, 2014, as follows:

> The university requires medical documentation for all requests for restrictions, light duty or other accommodations. Because we did not have documentation on file for you, *we followed our standard practice and temporarily relieved you from your duties until you could provide us with such documentation from your physician*. Until you submitted the recent note from Dr. Bloomgarden's office on Sunday, attached

---

[7]  As of January 24, 2014, Plaintiff's medical documentation on file released him to work regular duty, stating he may "continue without restrictions." Doc. 40-18, ¶ 11.  Said documentation also referenced the date of his injury as "6.12.13" and the nature of that injury: "Diagnosis: LT Shld/LT Elbow." *Id.*

to this email and dated 1/24/14, all of the doctors' notes in the file, convey your status as regular duty with no restrictions at all.

*Id.* (Evarts Dep., Ex. J) (emphasis added).

Lambusta then offered to provide Plaintiff with a job description to enable his physician to "make an accurate assessment of [Plaintiff's] ability to perform [his] job, including what accommodations are needed." *Id.* She assured Plaintiff he would be fully compensated for his scheduled work hours on January 24, 27, and 28. *Id.* She also requested Plaintiff to provide documentation of his surgery date, a follow-up report as to his upcoming medical appointment to update his status, and any additional measures that Quinnipiac could take to accommodate his needs. *Id.*

In light of Dr. Bloomgarden's statement on January 24, 2014, indicating that Plaintiff was "unable to return to work . . . until further notice," Quinnipiac's Human Resources Department interpreted his absence as involving a "serious health condition" within the meaning of the FMLA and directed Plaintiff to have his physician complete the FMLA paperwork. Doc. 33-5 & 40-18, ¶ 16; Doc. 33-3 (Affidavit of Lori Musante ("Musante Aff.")), ¶ 3. Plaintiff, however, disagreed, believing that because his injury was work-related, involving a workers' compensation claim, the FMLA was not applicable.[8] Doc. 33-5 & 40-18, ¶ 17. It was finally mid-March of 2014, a day or two before Plaintiff's scheduled surgery when he picked up the FMLA paperwork from Quinnipiac and gave it to his physician. Doc. 33-5 & 40-18, ¶ 18; Evarts Dep., at 126-27.

On or about March 17, 2014, Plaintiff submitted to Quinnipiac a "Certification of Health

---

[8] According to Lori Musante, Quinnipiac's then Human Resources Business Partner, she explained to Plaintiff that workers' compensation claims and the FMLA may run concurrently, but Plaintiff continued to assert that his leave was not governed by the FMLA. *See* Doc. 33-3 ("Musante Aff."), ¶ 3.

Care Provider for Employee's Serious Health Condition," completed by Patrick Tomak, M.D., Plaintiff's spinal surgeon. Doc. 33-5, ¶ 19. The form, dated March 14, 2014, indicated that Plaintiff would be out of work from March 18, 2014 (the date of surgery) until June 18, 2014. Doc. 33-5, ¶ 19; Evarts Dep., at 113-14, 187; Doc. 33-2, at 59-62 (Evarts Dep., Ex. K). Along with this form, Plaintiff submitted an "Employee Statement of Understanding," detailing the terms of his FMLA leave, which included the following provisions: (1) paid leave would be used concurrently; and (2) before returning from leave, Plaintiff would provide a certification from his health care provider confirming that he was medically able to resume work. Doc. 33-5 & 40-18, ¶ 20; Doc. 33-2, at 63 (Evarts Dep., Ex. L).

Until late April 2014, Plaintiff received paychecks from Quinnipiac for forty (40) hours per week at his regular rate of pay through a combination of vacation time, sick time, and personal time. Doc. 33-5 & 40-18, ¶ 21; Evarts Dep., at 207-10. In a letter dated April 25, 2014, Tina Monteiro, Quinnipiac's Human Resources Coordinator, informed Plaintiff that his accrued paid time off had been exhausted and his FMLA leave allotment would run out on May 1, 2014, based on his first day out of work being January 27, 2014. Doc. 33-5 & 40-18, ¶ 22; Doc. 33-2, at 64 (Evarts Dep., Ex. N.).

On April 29, 2014, Plaintiff presented a "Return to Work" note from Dr. Tomak dated April 28, 2014, indicating that Plaintiff could return to sedentary work on May 5, 2014, six weeks earlier than the originally projected date of June 18. Doc. 33-5, ¶ 23; Doc. 33-2, at 65 (Evarts Dep., Ex. O); Doc. 33-3 (Musante Aff.), ¶ 4. Also on April 29, Plaintiff submitted a second medical note to Quinnipiac, dated March 10, 2014, and issued by Dr. David Cohen, who treated Plaintiff's shoulder and knee. Doc. 33-5 & 40-18, ¶ 23; Evarts Dep., at 165, Doc. 33-2, at 66 (Evarts Dep., Ex. P); Doc. 33-3 (Musante Aff.), ¶ 5. In this note, Doctor Cohen released Plaintiff to return to work as of March

11, 2014, seven days before his scheduled surgery, in a sedentary position that would not require him to lift, push, pull, reach over shoulder-level height, walk distances, or direct traffic. Doc. 33-5 & 40-18, ¶ 23; Evarts Dep., at 164, Doc. 33-2, at 66 (Evarts Dep., Ex. P).

After receiving the notes, Musante, then Quinnipiac's Human Resources Business Partner, faxed Dr. Tomak a copy of the public safety officer job description, requesting clarification regarding the full extent of Plaintiff's restrictions. Doc. 33-5 & 40-18, ¶ 23. In particular, Musante sought clarification because there was no uniform definition of "sedentary" as applied to the workplace and Dr. Tomak's FMLA certification indicated that Plaintiff would be unable to perform all job functions until he was evaluated 12 weeks after his March 18 surgery (approximately June 18). Doc. 33-5 & 40-18 , ¶ 23; Doc. 33-3 (Musante Aff.), ¶ 6; Evarts Dep., at 163; Doc. 33-2, at 59-62 (Ex. K). Dr. Tomak's nurse phoned Musante and advised her that Plaintiff was restricted to a "desk job" and could not lift, push or pull over ten pounds, perform tasks that might involve physical contact, or respond to emergencies. Doc. 33-5 & 40-18, ¶ 25 (citing Musante Aff., ¶ 7). Musante then described the responsibilities of the post at the medical school, the various gates on campus, and dispatch. In response, Dr. Tomak's nurse advised that Plaintiff could work either at a gate or in dispatch. Doc. 33-3 (Musante Aff.), ¶ 7. Moreover, the nurse stated that Plaintiff had a follow-up appointment on June 9, 2014, after which she would provide an update. *Id.*

In late May or early June, Plaintiff met with Musante and Ron Mason, Quinnipiac's then Vice President of Human Resources, to discuss the options for Plaintiff's return to work. Doc. 33-5 & 40-18, ¶ 26; Evarts Dep., at 151-52. Certain positions discussed were determined to be unsuitable.[9]

---

[9] For example, the library post violated Plaintiff's walking restrictions and dispatch was a position that involved reaching overhead for certain books. Evarts Dep., at 151-52.

Musante and Mason offered Plaintiff a position on the security desk at North Haven, but explained that the job was "rotational" and would require him to patrol on foot for a portion of the shift. Doc. 33-5 & 40-18, ¶ 26; Evarts Dep., at 152. Plaintiff replied that he thought the North Haven post involved an 8-hour assignment at the desk without any rotation during the shift. Doc. 33-5 & 40-18, ¶ 26; Evarts Dep., at 152-53.

On June 4, 2014, Human Resources Coordinator Tina Monteiro sent Plaintiff a letter in which she corrected an error in her previous April 25, 2014, letter regarding the expiration of Plaintiff's FMLA leave. Doc. 33-5 & 40-18, ¶ 27. The April letter had mistakenly identified May 1, 2014 as the date Plaintiff's FMLA leave would be exhausted, but the June 4 letter confirmed that Plaintiff's FMLA leave actually expired on May 19, 2014 (16 weeks after Plaintiff's initial absence on January 27, 2014), per the requirements of Connecticut law.[10] *Id.*; *see also* Doc. 33-2, at 64, 67, (Evarts Dep., Ex. N, Q). In response to the letter, Plaintiff phoned Musante to ask why he had not yet been reinstated to his position. Doc. 33-5 & 40-18, ¶ 28. Musante explained that Quinnipiac required a release from Plaintiff's doctors before he could return to work, as indicated in the "Employee Statement of Understanding" he had signed. *Id.*, Doc. 33-2, at 6 (Evarts Dep., Ex. L) (attesting that "[b]efore I return to work following a leave for my own serious health condition, I will be required to provide certification from a health care provider that I am medically able to resume work").

_____

[10] Pursuant to Connecticut's Family and Medical Leave Act, "an eligible employee shall be entitled to a total of sixteen workweeks of leave during any twenty-four-month period" for certain enumerated reasons which include, *inter alia*, "a serious health condition of the employee." Conn. Gen. Stat. Ann. §§ 31-51ll (a)(1), (a)(2)(D). Under that state statute, Plaintiff thus received four additional weeks of leave beyond the twelve weeks mandated by the federal FMLA.

On June 10, 2014, one day after Plaintiff's follow-up June 9 appointment with Dr. Tomak, Musante phoned Plaintiff to inquire whether Dr. Tomak had issued him a "return to work note." Doc. 33-5 & 40-18, ¶ 29. Plaintiff explained that he had seen Tomak the day before but would not receive a note from him for a few days. *Id.*; Doc. 33-3 ( Musante Aff.), ¶ 18. He also said that he had a scheduled appointment to see Dr. John McCallum, his knee doctor, on June 18, 2014. Doc. 33-5 & 40-18, ¶ 29.

On June 16, 2014, Plaintiff submitted a report from his June 9 appointment with Dr. Tomak indicating that Plaintiff was medically cleared to return to a desk position at the medical school. Doc. 33-5 & 40-18, ¶ 30; Doc. 33-2, at 69 (Evarts Dep., Ex. S); Doc. 33-3 (Musante Aff.), ¶ 9. Tomak had been given an official job description for a security officer, including functions that were physically demanding beyond the scope of Plaintiff's restrictions. Doc. 33-2, at 44-48 (Evarts Dep., Ex. B). However, Plaintiff also provided Dr. Tomak with a document regarding "Medical School Desk and Law School Desk Duties," positions comprised mainly of sedentary functions and created by the sergeant in charge of the North Haven campus. Evarts Dep., at 172-75; Doc. 33-2, at 71-72 (Evarts Dep., Ex. T).

After Plaintiff met with Dr. McCallum on June 18, McCallum documented the following restrictions: no gate duty, limited walking, and sedentary work until Plaintiff was seen in two weeks for a follow-up appointment. Doc. 33-5 & 40-18, ¶ 32; Evarts Dep. at 188-89, Doc. 33-2, at 73 (Evarts Dep., Ex. U). Around this time, Quinnipiac received a June 3, 2014, note from Dr. Cohen stating that Plaintiff was cleared for "Sedentary Work," defined as "[l]ifting 10 lbs maximum, carrying such articles as dockets, ledgers, and small tools." Doc. 33-5, ¶ 33; Doc. 33-3 (Musante Aff.), ¶ 10; Doc. 33-2, at 68 (Evarts Dep., Ex. R). Such "[w]ork essentially involves sitting and is

considered sedentary if only a small amount of walking is necessary to carry out your duties." Doc. 33-2, at 68 (Evarts Dep., Ex. R). Dr. Cohen then listed the following restrictions: "no lifting, limit walking, no long distance walking, and no directing traffic." *Id.*

In mid-June, Musante phoned Plaintiff and informed him that he would be assigned exclusively to the desk at the North Haven campus, consistent with his desires and the restrictions imposed by his physicians. Doc. 33-5 & 40-18, ¶ 34; Evarts Dep., 156-58; Doc. 33-3 (Musante Aff.), ¶ 12. Plaintiff returned to work to that position on June 28, 2014, and was assigned to a security desk at the North Haven campus. Doc. 33-5 & 40-18, ¶ 35. Since that time, there has been no deviation in his responsibilities. *Id.*, Evarts Dep., at 193-94. According to Quinnipiac, and with no contradictory evidence presented by Plaintiff, Plaintiff is the only officer with an exclusive desk assignment because all other security officers must rotate posts with varying degrees of frequency. Doc. 33-5 & 40-18, ¶ 36; *see also* Doc. 33-4 (Lambusta Aff.), ¶ 9; Evarts Dep., at 60-61, 161-62. In other words, Quinnipiac essentially asserts that it created a unique position for Plaintiff for his continued employment. Plaintiff remains confined to sedentary work and Quinnipiac has honored his restrictions from the time he returned to his position in late June 2014. Doc. 33-5 & 40-18, ¶ 37; Evarts Dep., at 189-91.

With respect to Plaintiff's workers' compensation claim, on June 24, 2014, Travelers Insurance Company accepted Plaintiff's claims for the June 2013 fall as a work-related injury. Doc. 33-5 & 40-18, ¶ 38; Evarts Dep., at 195. Travelers retroactively paid Plaintiff workers' compensation benefits for the period beginning on January 27, 2014 until May 6, 2014. Doc. 40-18, ¶ 38; Evarts Dep., at 196. Plaintiff received "double payment" for this period because Plaintiff used various forms of "paid leave" (sick time, vacation time, and personal time) to cover a portion

of his leave before the workers' compensation claim was approved. Doc. 33-4 (Lambusta Aff.), ¶ 7. The total double payment consisted of 301.5 hours of sick time, 127 hours of vacation, and 16 hours of personal time. Doc. 33-2, at 74 (Evarts Dep., Ex. W). At the hourly rate of $19.11, the double payment added up to $8,494.40. *Id.*

Due to this period of double payment, Quinnipiac contacted Plaintiff about making reimbursement to his account for the paid time he had used during his leave because he had now been paid by Travelers for the same period. *Id.* It is customary for employees to repay paid leave following acceptance of a workers' compensation claim so that paid time off may be restored to the employee for later use. Doc. 33-5 & 40-18, ¶ 39; Doc. 33-4 (Lambusta Aff.), ¶ 7. When asked whether he wished to repay the double payments, Plaintiff stated that he wanted to arrange a plan of repayment after speaking to an attorney, but he never got back to Quinnipiac regarding repayment. Consequently, the paid time was never restored. Doc. 33-5 & 40-18, ¶ 40; Evarts Dep., at 198, Doc. 33-4 (Lambusta Aff.), ¶ 8.

In addition to filing his workers' compensation claim, Evarts pursued a personal injury action against MagnaKleen, the company that installed and serviced the floor mat over which he tripped. Doc. 33-5 & 40-18, ¶ 41. That action settled for the sum of $275,000, of which $84,236.24 was paid to Plaintiff's lawyers as fees and $1,181.77 covered costs incurred. *Id.* An additional $82,081.99 was paid to Standard Fire Insurance Company to pay off a lien, representing the amount that was given back to the workers' compensation carrier by MagnaKleen to account for expenses the carrier paid for Plaintiff's lost wages and medical benefits. *Id.* Plaintiff retained the balance of the settlement proceeds (approximately $107,500). Evarts Dep., at 205, Doc. 33-2, at 49-53 (Evarts Dep., Ex. H).

# IV. DISCUSSION

## A. Quinnipiac's Motion for Summary Judgment

In its Motion for Summary Judgment, Quinnipiac moves for dismissal of Plaintiff's Complaint in its entirety. Quinnipiac thus requests summary judgment on Plaintiff's claims arising under: (1) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*; and (2) the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* Quinnipiac argues that Plaintiff has failed to adduce "sufficient evidence in discovery to engender a genuine issue of material fact" as to either of these claims; and accordingly, the Court must dismiss them as a matter of law. Doc. 33, at 1.

First, Quinnipiac states that "Plaintiff's FMLA claim appears to be based on an interference theory, but there is no evidence that his FMLA rights were impinged in any way." *Id.* Specifically, a "faulty premise" underlies Plaintiff's contention that Quinnipiac began "running the clock on his FMLA leave" at the wrong time. *Id.* Rather, Quinnipiac "properly designated plaintiff's extended leave of absence for a 'serious health condition' as FMLA-covered as of the first day he was out." *Id.* In addition, as to the allegation that Quinnipiac delayed in reinstating him, "the record is clear that plaintiff was promptly and timely restored to the same position he held prior to the leave (modified to accommodate his medical restrictions), at the same rate of pay and with the same level of benefits, immediately after appropriate medical certifications were provided." *Id.*, at 2. Furthermore, even had there been any delay, Plaintiff "was fully compensated during the entirety of his leave" so that "any delay in restoring plaintiff to his prior job did not result in prejudice." *Id.* Consequently, in the absence of prejudice, concludes Quinnipiac, an "interference claim will not lie." *Id.*

Next, with respect to Plaintiff's ADA failure to accommodate and/or discrimination claim, Quinnipiac argues that the claim must be dismissed a matter of law. Plaintiff has "challeng[ed] [Quinnipiac's] directive sending him home after he announced he was unable to perform one of his job duties." *Id.* However, that claim "is undone by a contemporaneous doctor's note declaring plaintiff unable to work until further notice." *Id.* Also, with regard to Plaintiff's claim that there was an "8-week lag between a note releasing him to 'sedentary' work and his return to the workplace," Quinnipiac has a legitimate business reason (*i.e.*, it was "waiting on appropriate medical certifications"), and Plaintiff has failed to gather sufficient evidence to create "an inference of disability-based discrimination" or to prove that Quinnipiac's reason for the delay was a pretext for such discrimination. *Id.* Quinnipiac thus requests that the Court dismiss this claim as well. *Id.*

Plaintiff opposes Quinnipiac's motion for summary judgment and asserts that there exist "genuine issues of material fact with respect to whether the Defendant interfered with the rights and benefits afforded to the Plaintiff under the Family and Medical Leave Act; whether the Plaintiff was afforded reasonable accommodations when required to do his job under the Americans With Disabilit[ies] Act; and whether the Defendant discriminated against the Plaintiff as a result of his disability." Doc. 40, at 1.

**B.** **FMLA**

The FMLA, 29 U.S.C. § 2601, *et seq*., provides employees with distinct rights to take leave under certain medical circumstances. First, it "generally requires covered employers to grant employees who have worked for twelve months (or 1250 hours in twelve months) up to twelve weeks' leave during any twelve month period for, *inter alia*, a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hale v. Mann*, 219

F.3d 61, 68 (2d Cir. 2000) (quoting 29 U.S.C. § 2612(a)(1)(D)). Furthermore, the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA." *Hale*, 219 F.3d at 68 (citing 29 U.S.C. § 2614(a)(1)). The FMLA allows leave to be taken "intermittently or on a reduced leave schedule when medically necessary" as well as on a full-time basis. *Poitras v. ConnectiCare, Inc.*, 206 F. Supp. 3d 736, 742-43 (D. Conn. 2016). Moreover, the statute requires an employer to reinstate the employee to his or her former position at the end of FMLA leave, unless the employee is unable to perform an essential function of the job at the end of his [or her] leave." *Id.*

The Second Circuit recognizes two types of FMLA claim: retaliation and interference. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir.2004) (per curiam). To plead an FMLA retaliation claim, one must establish: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. *See also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (applying FMLA retaliation elements set forth in *Potenza*).

To bring a retaliation claim, the employee must show that his or her employer has retaliated for that employee's exercise of FMLA rights. In such retaliation cases, the Second Circuit employs the *McDonnell Douglas* burden-shifting analysis.[11] *Potenza*, 365 F.3d at 168 ("In the context of [Plaintiff]'s claim, the retaliation analysis pursuant to *McDonnell Douglas* is applicable."). *See also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) ("We will analyze the retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in

---

[11] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

18

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)").[12]

Alternatively, one may bring an interference claim, alleging interference with one's FMLA rights. To succeed on an interference claim, one must establish: 1) that he is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that he was entitled to take leave under the FMLA; 4) that he gave notice to the defendant of his intention to take leave; and 5) that he was denied benefits to which he was entitled under the FMLA. *See, e.g.*, *Graziadio,* 817 F.3d at 424; *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (quoting 5 *Graziadio* elements and noting that "our Court has 'formally adopt[ed]' this 'standard regularly used by district courts of this Circuit' – . . . [for a plaintiff] to prevail on an interference claim") (quoting *Graziadio*, 817 F.3d at 424).

### 1. <u>Quinnipiac's Argument in Favor of Summary Judgment on the FMLA Claim</u>

Quinnipiac concludes, on the facts and pleadings currently presented, that interference is the premise of Evarts's FMLA claim. As set forth *supra*, to succeed on an FMLA interference claim, the Plaintiff must "establish that the defendant denied or otherwise interfered with a benefit to which [he] was entitled under the FMLA." *Graziadio*, 817 F.3d at 424. He must show that he "has been prejudiced by the violation." *Roberts v. Health Ass'n*, 308 F. App'x 568, 569 (2d Cir. 2009). Quinnipiac asserts, however, that "[t]he undisputed facts of record do not allow for a finding that

---

[12] If the plaintiff successfully meets the initial burden of alleging the elements of retaliation, the burden shifts back to the employer to state a legitimate non-discriminatory reason for its action. Then, if the defendant is able to provide such a reason, the burden returns to the plaintiff to prove that the defendant's articulated reason for its action is "pretextual" so that the only real reason was retaliation for plaintiff's exercise of rights protected under the FMLA. *See Graziadio*, 817 F.3d at 429. *See also, e.g., Stevens v. Coach U.S.A.*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005); *Kuo v. Computer Assocs. Int'l, Inc.*, No. 05-CV-3295 (DRH) (JO), 2007 WL 2874845, at *5 (E.D.N.Y. Sept. 27, 2007).

plaintiff's FMLA rights were compromised in any way, or that he was prejudiced by [Quinnipiac's] processing of his leave."  Doc. 33-1, at 17.

Quinnipiac states that Evarts bases his interference claim on the "misguided belief that QU impermissibly designated his medical leave as FMLA-protected, and began drawing down his statutory 12-week leave allowance (16 weeks under Connecticut's version of the FMLA),[13] starting with the first day of his extended absence for a 'serious health condition' and not some two months later when he had surgery".[14]  Doc. 33-1, at 3.  Quinnipiac believes, however, that the timing of the FMLA leave designation was "fully in line with the statutory mandates and regulatory guidance" so that "there was no interference" with his FMLA rights.  *Id.*

According to Quinnipiac, by providing a note from Dr. Bloomgarden, stating that Plaintiff was "currently under [his] care and at this time [was] unable to work  . . .  until further notice," Plaintiff provided sufficient notice to trigger Quinnipiac's duty to either place him on leave or inquire further to confirm that FMLA leave was indeed applicable.  *See* 29 C.F.R. § 825.302(c).  From the note, it was clear that Plaintiff had a "serious health condition," which was "an illness, injury, impairment, or physical . . . condition that involve[d]" the "continuing treatment by a health care provider." 29 U.S.C. § 2611(a)-(B).  *See also* 29 C.F.R. § 825.113(a).  Such notice thus triggered Quinnipiac's duty to treat Plaintiff's projected, indefinite inability to work as FMLA leave. *See* 29 C.F.R. § 825.302(c) (information to provide notice of needed FMLA leave may include "that a condition renders the employee unable to perform the functions of the job"). From January 27, 2014,

---

[13]  *See* Conn. Gen. Stat. §§ 31-51ll (a)(1), (a)(2)(D) (granting an employee with "a serious health condition" sixteen workweeks of leave during a twenty-four-month period).

[14]  Quinnipiac refers to itself throughout its motion papers with the abbreviation "QU" for Quinnipiac University.

until May 19, 2014, Plaintiff was given the full twelve weeks of FMLA leave mandated by the federal statute, 29 U.S.C. § 2612 (a)(1)(D), and an additional four weeks pursuant to Connecticut's FMLA, Conn. Gen. Stat. §§ 31-51ll (a)(1), (a)(2)(D*).

Moreover, Quinnipiac asserts that it is undisputed that Quinnipiac "went above and beyond its obligations under the FMLA by allowing [Evarts] to remain on leave long after his FMLA entitlement was exhausted and thereafter restoring him to the same basic position he had prior to the leave (modified to accommodate his medical restrictions) at the same rate of pay and with the same level of benefits." Doc. 33-1, at 3. When Plaintiff's FMLA leave expired, on May 19, 2014, Quinnipiac's HR Manager, Tina Monteiro, told him to request personal leave, Doc. 33-2, at 64, which was then granted until he was restored to his position as security guard in June 2014. *See* Evarts Dep., at 193.

As to the allegation that Quinnipiac interfered with Plaintiff's FMLA rights by failing to reinstate him on May 5, 2014, the date Dr. Tomak's April 28, 2014, note indicated that he would be ready to handle sedentary work, Doc. 40-1, at 5, Quinnipiac points out that the note conflicted with Dr. Tomak's prior written FMLA certification, which indicated that Plaintiff would be incapacitated until June 18, 2014, Doc. 33-2, at 61 (Evarts Dep., Ex. K). The conflict in these two documents led Quinnipiac to seek "clear and unambiguous medical releases from each of [Plaintiff's] doctors to identify the precise limitations as a condition of returning."[15]  Doc. 33-1, at 19. Although the

---

[15] Evarts argues that Quinnipiac engaged in discriminatory gamesmanship when it required him to provide additional releases after Dr. Tomak, his back surgeon, indicated he could return to work on May 5, 2014. Quinnipiac notes, however, that Evarts's departure from work on January 24, 2014, was not triggered by his back surgery, but rather due to a complaint that his "right knee and shoulder were giving out." Evarts Dep., at 168, Doc. 33-2, at 54 (Evarts Dep., Ex. I). The release from his spinal surgeon had no relation to the conditions that originally prevented Plaintiff from performing his duties at Gate 1 at the beginning of his leave of absence. Therefore, Quinnipiac's

"FMLA makes  restoration required once an employee's entitlement arises (*i.e.*, once he is capable

of performing the job's essential functions)," an employer still has "the ability to condition restoration

upon medical certification that the employee is able to return." *See, e.g., Hoge v. Honda of America

Mfg., Inc.*, 384 F.3d 238, 247 (6th Cir. 2004).[16]

Furthermore, Quinnipiac maintains that even if there had been a  delay in reinstating Plaintiff

to his former position, he suffered no prejudice due to that delay.   Quinnipiac emphasizes that Evarts

"was undisputedly fully compensated for the entirety of his leave by a combination of paid leave,

workers' compensation benefits, and the settlement of his personal injury claim." Doc. 33-1, at 20.

He thus "experienced no financial loss or other tangible detriment." *See* Evarts Dep., at 135-37, 205,

201-10; Ex. H, AA. Absent prejudice resulting from Quinnipiac's actions under the FMLA, Plaintiff

is precluded from prevailing on his interference claim under the FMLA.  Doc. 33-1, at 20 (citing

*Hewlett v. Triple Point Technology, Inc.*, 171 F. Supp. 3d 10, 18 (D. Conn. 2016)(rejecting FMLA

interference claim where plaintiff failed to establish prejudice); and *Gilmore v. Univ. of Rochester*,

654 F. Supp. 2d 141, 149-50 (W.D.N.Y. 2009) (dismissing FMLA claims on summary judgment

---

request for releases from all pertinent physicians was reasonable, not discriminatory.  Quinnipiac
suggests that it would have been irresponsible, and perhaps even dangerous, to restore Plaintiff to
his position before Quinnipiac obtained  all relevant information about his current health. That is
why Quinnipiac sought releases from all of Plaintiff's doctors and engaged in an ongoing
conversation with Dr. Tomak, Plaintiff's back surgeon, about Plaintiff's ability to perform his job
duties in light of his present medical conditions.   Evarts Dep., at 163,  Doc. 33-3 (Musante Aff.),
¶¶ 6-7.

[16]  *See also* 29 U.S.C. § 2614(a)(4) ("As a condition of restoration . . . an employee who has
taken leave under section 2612(a)(1)(D) of this title, the employer may have a uniformly applied
practice or policy that requires each such employee to receive certification from the health care
provider of the employee that the employee is able to resume work . . . . .").

because "plaintiff has failed to show that there is a genuine issue of fact concerning whether she was injured or prejudiced as a result of the University's alleged violation"). In sum, Quinnipiac concludes, none of its actions damaged Plaintiff in violation of the FMLA.

### 2. Plaintiff's Arguments in Opposition to Summary Judgment on His FMLA Claim

Plaintiff's argument against summary judgment on his FMLA claim is that his leave did not actually begin until March because Quinnipiac "did not give adequate notice to the Plaintiff that [it] was designating [his] leave as FMLA qualifying leave." Doc. 40-1, at 8. In particular, Plaintiff states that he takes issue with the fourth requirement to establish an interference claim: whether the employer denied him benefits he was entitled to under the Act. He argues that Defendant wrongly determined the start date for his FMLA leave as the first day of his absence. Doc. 40-1, at 10. Moreover, he claims that Quinnipiac violated the notice requirements of the FMLA, which state as follows:

> The employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee as provided in this section. When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances. . . . If the employer requires paid leave to be substituted for unpaid FMLA leave, or that paid leave taken under an existing leave plan be counted as FMLA leave, the employer must inform the employee of this designation at the time of designating the FMLA leave.

29 C.F.R. § 825.300 (d)(1).

Plaintiff interprets this provision to mean that "an employee's FMLA leave does not begin until the employer has provided the employee with adequate written notice that the employer is designating the leave as FMLA qualifying." Doc. 40-1, at 11. As support for his position, Plaintiff

describes cases in which the employer failed to provide the plaintiff with the proper paperwork to apply for FMLA leave, thereby depriving that plaintiff of the opportunity to take such a leave. *See* Doc. 40-1, at 11-12 (citing *Voltaire v. Home Services Systems*, 823 F. Supp. 2d 77, 91 (E.D.N.Y. 2011), *Sims v. Schultz*, 305 F. Supp. 2d 838, 845 (N.D. Ill. 2004)). He also cites *Blankenship v. Buchanan General Hospital*, 999 F. Supp. 832 (W.D. Va. 1998), a case in which a terminated employee sued her employer for violation of the FMLA, alleging that it had failed to give her notice of the start date of designated FMLA leave and misrepresented the date upon which she was to return to work. The court denied summary judgment because there remained issues of fact regarding these assertions. The *Blankenship* case "imposes a burden on an employer to notify an employee [of the FMLA dates] within a reasonable time when paid leave is to be counted as FMLA leave." 999 F. Supp. at 836.[17]

---

[17] The *Blankenship* case, which is outside this Circuit, offers no persuasive authority or assistance on the present facts, because it merely held that once the employer designated FMLA leave, it should have informed the employee of that designation within one month. 999 F. Supp. at 836. Here, "[a]round the time plaintiff went out on leave [in January 2014], QU's human resources department informed [him] that he would need to complete FMLA paperwork." Doc. 40-18, ¶ 31. That was because Quinnipiac had determined that the leave qualified as FMLA leave. *Id.*, ¶¶16-17. Plaintiff thus knew of Quinnipiac's intention to designate his leave as FMLA leave from January 2014. He simply refused to agree that said designation was proper at that time, and thus failed to submit the FMLA forms to his physician for completion until March 2014.

Plaintiff also cites *Hayles v. Advanced Travel Management Corp.*, No. 01 CIV. 10017 (BSJ) (DFE), 2003 U.S. Dist. LEXIS 23407 (S.D.N.Y. January 5, 2004) regarding notice. However, that case supports summary judgment on the FMLA "interference" claim when the employer starts the process of designating leave as FMLA-protected from the time of receipt of the employee's doctor's note. In that case, the court wrote:

> Regarding the employee's claim that the employer had unlawfully interfered with her rights provided under the FMLA, the court found that the employee provided no evidence and alleged no facts regarding any behavior that could be construed as "interference" with the employee's rights under the FMLA. The evidence showed that the employer mailed the employee FMLA forms almost immediately upon receipt of

Plaintiff argues that "there is a genuine issue of material fact as to when the Plaintiff received notice in writing that Defendant was designating the Plaintiff's leave as qualified under the FMLA." Doc. 40-1, at 13. Plaintiff alleges that he received no written notice of his FMLA leave until March 14, 2014, or within "two to three days before" his scheduled back surgery. Evarts Dep., at 126-27.

### 3. Analysis

The crux of Plaintiff's FMLA claim is that Quinnipiac began his FMLA leave too early, designating it to commence on January 27, 2014, instead of just before his back surgery on March 18, 2014. Because this designation prevented him from working from late January until mid-March 2014, he was unable to earn wages during that period. He also argues that he did not receive prompt notice of the application of FMLA leave to his time out of work. As set forth below, neither of these assertions sets forth a viable FMLA "interference claim" on the undisputed facts of this case.

As to the commencement of Plaintiff's FMLA leave, Quinnipiac designated the start date as January 27, 2014, the first work date following Plaintiff's submission of Dr. Bloomgarden's note, specifying that Evarts was "unable to return to work" and "[t]his restriction will be in effect until

---

the note from her doctor stating that the employee would be medically unable to return to work.

2003 U.S. Dist. LEXIS 23407, at *1. Plaintiff points to the fact that the defendants in *Hayles* "mailed the plaintiff the FMLA forms immediately." Doc. 40-1, at 12. In this case, Quinnipiac also designated the leave as FMLA-protected leave from day one, but asked Plaintiff to pick up the FMLA paperwork , directing him to have his physician complete it. Doc. 33-5 & 40-18, ¶ 16. In *Hayles*, as in this case, the employer began the FMLA process from the date it received the doctor's note that the employee was medically unable to work. Given these facts, *Hayles* fails to support Plaintiff's opposition to summary judgment on the interference claim.

further notice."[18]  Doc. 33-2, at 58  (Evarts Dep., Ex. J).  This note was a follow-up to Plaintiff's statements that he "was having difficulty" because his "knee was giving out," Evarts Dep., at 125.  In his deposition testimony, Plaintiff explained that  Bloomgarden had concerns that Evarts might fall and "do more damage to [his] neck and to [his] cervical spine" so he decided to "put [Evarts] out of work." *Id.*

As to the onset of FMLA leave, to qualify as a basis for FMLA leave, one must have a "serious health condition," which is defined as "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" in a medical facility or "continuing treatment by a health care provider." 29 U.S.C. § 2611 (11)(A)-(B). *See also* 29 C.F.R. § 825.113(a).  Notice must, therefore,  reference or describe such a serious health condition and treatment by a health care provider to place an employer on notice of FMLA leave.

"Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 15-16 (D. Conn. 2018) (citation omitted). As stated in the regulations, in making the requisite notification, "[a]n employee seeking leave need not expressly invoke the FMLA." *Id.* (quoting *Brown*, 488 F. Supp. 2d at 408-09).  It is thus sufficient if an employee gives a basis for leave that qualifies under the FMLA.

Moreover, under 29 C.F.R. § 825.301(d),  "[i]f an employer does not designate leave as required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 provided that the employer's failure to

---

[18] The undisputed record indicates that Plaintiff was sent home on January 24, 2014, but was nonetheless fully compensated for January 24, 27, and  28, 2014, dates for which he had been scheduled to work.  Doc. 40-18, ¶ 15.

timely designate leave does not cause harm or injury to the employee." Therefore, the retroactive designation of FMLA leave does not constitute "interference," absent some harm or injury to Plaintiff. *See, e.g.*, *Dighello*, 307 F. Supp. 3d at 21 n.18.

In the case at bar, once Plaintiff provided the note from Dr. Bloomgarden stating that he was "unable to work . . . until further notice," Quinnipiac had the duty to either place him on leave or inquire further to confirm that FMLA leave was applicable. *See* 29 C.F.R. § 825.302(c). From the note, it was clear that Plaintiff had a "serious health condition," which was "an illness, injury, impairment, or physical . . . condition that involve[d] . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B). *See also* 29 C.F.R. § 825.113(a). The letter thus triggered Quinnipiac's duty to treat Plaintiff's projected, indefinite inability to work as FMLA leave. *See* 29 C.F.R. § 825.302(c) (information to provide notice of needed FMLA leave may include "that a condition renders the employee unable to perform the functions of the job").

Although the note did not indicate an emergency *per se*, it stated that Plaintiff was "under [Dr. Bloomgarden's] care" and was accompanied by a request that Plaintiff "be completely out of work until [he] ha[d] surgery." *See* Doc. 33-2, at 56, 58 (Email from Lambusta to Evarts on January 28, 2018; and Bloomgarden note, dated January 24, 2018). Because a "serious health condition" and care by a physician lasting longer than three days were both implicated, the condition for which Plaintiff needed FMLA leave had commenced.

From the undisputed facts, the Court cannot find fault with Quinnipiac's designation of Plaintiff's FMLA leave from that point. Granted, Plaintiff would have preferred to work longer before his leave commenced. He would have liked to continue to earn wages until his surgery date in March; however, his own doctor's note of January 24, 2014, which he presented to Quinnipiac,

made clear that he was already unable to perform his job. Moreover, when questioned at his deposition, Plaintiff himself admitted that "between January 23, 2014, and the surgery on March 18, 2014," he was "incapacitated" and that neither Bloomgarden nor Tomak had released him to return to work during that period. Evarts Dep., at 128-29.

Under those circumstances, immediate FMLA leave following the January 24 Bloomgarden note was both reasonable and proper. As the regulations provide: "If the employer has sufficient information to designate the leave as FMLA leave immediately after receiving notice of the employee's need for leave, the employer may provide the employee with the designation notice at that time." 29 C.F.R. § 825.300(d)(2).

As to notice of the FMLA leave provided by Quinnipiac, it is undisputed that "[a]round the time plaintiff went out on leave, [Quinnipiac's] human resources department informed plaintiff that he would need to complete FMLA paperwork;" and he "demurred, taking the position that because his absence was tied to a work-related injury that occurred in June, 2013, his leave was not subject to the FMLA." Doc. 33-5 & 40-18, ¶ 31; Doc. 33-3 (Musante Aff.), ¶ 3. In other words, despite receiving oral notice from Quinnipiac that his leave was eligible for FMLA protection, Plaintiff insisted that his injury and related absence were simply a workers' compensation matter that did not involve the FMLA. Doc. 33-5 & 40-18, ¶ 17. Plaintiff asserts that from January 27 to March 18 of 2014, he was "[j]ust out – out of work on sick leave." Evarts Dep., at 146. He fails to acknowledge that an employee need not mention the FMLA statute for a covered employer to become obligated to provide him leave under the FMLA. The employee must simply provide evidence that he is suffering from a qualifying "serious medical condition." *See* 29 C.F.R § 825.302(c).

28

Furthermore, the fact that an employee purposely waits to have his physician fill out the necessary FMLA paperwork, hoping to stall the onset of FMLA leave, does not prevent retroactive designation of FMLA leave by an employer once the forms are completed.[19] *See* 29 C.F.R. § 825.301(d) ( "If an employer does not designate leave as required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 provided that the employer's failure to timely designate leave does not cause harm or injury to the employee."); *Dighello,* 307 F. Supp. 3d at 21 n.18 (retroactive designation of FMLA leave does not constitute "interference," absent some harm or injury to Plaintiff). Therefore, even if one assumes that Quinnipiac's official written approval of Plaintiff's FMLA leave should have been sent in January 2014, that failure to provide timely notice did not deprive Plaintiff of any benefits under the FMLA, including twelve weeks of leave and reinstatement to his prior position.

Plaintiff feels aggrieved that by setting the first day of Plaintiff's FMLA leave as January 27, 2014, his FMLA leave expired on May 19, 2014, six weeks before he returned to work.[20] Doc. 33-2,

---

[19] Plaintiff asserts that March 18, 2014, the date of his surgery, was the first date of his FMLA leave. That is when he provided his completed FMLA paperwork to Quinnipiac. Doc. 33-5 & 40-18, ¶¶ 18-20; Evarts Dep., at 187, Doc.33-2, at 59-62 (Evarts Dep., Ex. K).

Upon receipt of the FMLA paperwork, filled out by Dr. Tomak, Quinnipiac notified Plaintiff that his leave had been approved and designated as covered by the FMLA. Doc. 33-2, at 26 (Evarts Dep., at 137-38 (referencing Ex. M (document Quinnipiac provided to Plaintiff in mid-March, approving his FMLA leave request)).

[20] Quinnipiac specified that it based the calculation of these dates on Plaintiff's entitlement to sixteen weeks of leave "in accordance with the Connecticut Family and Medical Leave Act." Doc. 33-1, at 18 (n.6). *See also* Conn. Gen. Stat. § 31-51ll (a)(1), (a)(2)(D). Connecticut thus provides four more than the "twelve workweeks in any 12 months" provided under its federal counterpart. *See* 29 C.F.R. § 825.100(a).

at 67 (Evarts Dep., Ex. Q).[21]  However,  as Quinnipiac asserts, even if the date of Plaintiff's FMLA

leave were calculated from Plaintiff's preferred  mid-March date of his surgery, Plaintiff is unable

to prove an FMLA "interference" claim because he was never deprived of rights he was entitled to

under the FMLA, including reinstatement.  By either calculation, Plaintiff received the full 12 weeks

of leave to which he was entitled under the federal FMLA.[22]  *Wanamaker v. Town of Westport Bd.

of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014) (granting summary judgment on FMLA interference

claim where plaintiff was granted 12 weeks of FMLA leave).

In addition, Plaintiff was not discharged when his FMLA  leave expired on May 19, 2014,

but rather advised by Quinnipiac to request a personal leave of absence.  Doc. 33-2, at 64, 67 (Evarts

Dep., Ex. N, Q) (Letters from Tina Monteiro to Evarts, dated April 25 and June 4, 2014,

---

[21]  Under the FMLA, an employee is simply entitled to take 12 weeks of leave for the specified reasons.  There is no provision requiring the employer to pay wages to an employee if the employee does not have accrued paid leave.  Under 29 U.S.C. § 2612(c), the "leave granted . . . may consist of unpaid leave."  Moreover, "[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided . . . for any part of the 12-week period. . . ." 29 U.S.C.A. § 2612 (d) (2)(a).  Also, "[a]n employer may require an employee to exhaust her paid leave prior to requesting FMLA leave, and an employer may also decide whether such leave should run consecutively or concurrently."  *Id.* § 2612(d)(1)1(2); *see also  Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 15 (D. Conn. 2016), *appeal dismissed* (July 1, 2016), *reconsideration denied*, No. 3:13-CV-1382 (SRU), 2016 WL 3101998 (D. Conn. June 2, 2016).

[22]  Quinnipiac argues that Plaintiff suffered no financial detriment because he received payment to cover the entire period in which he was absent, first by using his own accrued time (sick leave, vacation, and personal), then again for these same amounts as workers' compensation by Travelers Insurance Company.  Doc. 40-18, ¶ 38 (Plaintiff admits that "Travelers retroactively paid [him] workers' compensation for the period starting on January 27, 2014" until May 6, 2014.).   In any event, prejudice in this context does not refer to the ability to earn wages during the FMLA leave period.  Rather it refers to the denial of *a benefit under the FMLA*, such as not being given the full statutory period of leave.  *See DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 182  (D. Conn. 2015) ("The alleged interference must ultimately result in a denial of a benefit under the FMLA.").

respectively, informing Plaintiff that once his FMLA leave is exhausted (on May 19, 2014), "please request a personal leave of absence from your HR Business Partner, Lori Musante"). Then when he was medically cleared to return to work via documentation from all of his treating physicians, Quinnipiac restored him to the same position he held before the leave, public safety officer assigned to a desk on the North Haven campus. Doc. 33-5 & 40-18, ¶ 35; Evarts Dep., at 193.[23]

In sum, whether Quinnipiac properly designated Plaintiff's FMLA leave to commence on January 27, 2014 and to expire on April 21, 2014, or designated that leave to commence on March 18, 2014, and to expire on June 10, 2014, the result is the same.[24] He was restored to his prior position after being given 12 full weeks of leave under the federal FMLA and an additional 4 weeks under its Connecticut counterpart. Not only did Quinnipiac allow Plaintiff to take his full FMLA leave, keeping his position open for twelve weeks, it further kept his position open *after that leave expired* until he returned.[25] Quinnipiac restored Evarts to the same position he held prior to his leave, as modified due to his medical restrictions.

---

[23] Quinnipiac asserts that this position of security officer at the law school is the "only public safety officer with an exclusive desk assignment, all other officers rotate with varying degrees of frequency." Doc. 33-5, ¶ 36. Plaintiff neither admits nor denies that this desk assignment is exclusive. Doc. 40-18, ¶ 5. However, whether or not the position is unique, what matters is that the position is a public safety officer position like the one Plaintiff held prior to his FMLA leave and that it does not present any of the activities from which Plaintiff is restricted.

[24] The date of the designated leave is not material in this case because Plaintiff indisputably received more than 12 weeks of FMLA leave, was further granted "personal leave" when the FMLA leave expired, and was then reinstated to his previous position upon medical certification by his relevant physicians that he was well enough to do so. Furthermore, whether Plaintiff considered himself to be on sick leave or FMLA leave in January 2014, he still would have collected sick leave and other paid leave beginning on January 27 so would have run out of paid leave in late April 2014.

[25] As in *Hewett v. Triple Point Technology, Inc.*, 171 F. Supp. 3d 10, 18 (D. Conn. 2016), where the court granted summary judgment for the defendant employer on the FMLA interference claim, Plaintiff benefitted from "a more generous leave policy than the statute itself requires."

Plaintiff may have wished he could have been reinstated to this security officer position on May 6, 2014. However, the record shows that the Tomak note, stating that Evarts could return to work as of May 5 conflicted with the FMLA certification for Evarts's return on June 18, 2014. Moreover, when Musante contacted Tomak's office, his nurse informed her that Plaintiff was due for a follow-up appointment on June 9. While awaiting a report from that appointment, Quinnipiac also communicated with Tomak's office in the interest of delineating a safe "sedentary" position for Plaintiff's return. Given the confusion of conflicting return dates in doctors' notes (*e.g.*, from Cohen and Tomak) and the variety of ailments involved (neck, shoulder, and knee), the resulting weeks of delay by Quinnipiac to gain all necessary medical certifications and to create or select a proper position for Plaintiff's return were reasonable.

In sum, Quinnipiac neither deprived Plaintiff of exercising his FMLA rights, nor discouraged or hindered the statute's use. Perhaps Plaintiff wished he could have worked to earn wages during his FMLA leave, but his own physician, Dr. Bloomgarden, explicitly declared him unable to do so on January 24, 2014 "until further notice." Therefore, Evarts needed to take leave from the date that note specified. Furthermore, Quinnipiac did not interfere with or prevent Plaintiff's treatment plans, scheduled surgery, or ultimate return to work. On the undisputed facts, Plaintiff has failed to establish a viable interference claim. *See, e.g.*, *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 17–18 (D. Conn. 2016) (granting summary judgment on FMLA interference claim where plaintiff "failed to demonstrate that she was actually denied any FMLA benefits during her employment, or that she was somehow hindered from exercising her rights by [employer's] failure to provide notice of the protections afforded under the Act") (citation and internal quotation marks omitted). Under these circumstances, the Court will grant summary judgment to Quinnipiac with respect to Plaintiff's

FMLA claim.

**B.     ADA**

Title II of the Americans with Disabilities Act ("ADA")  provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In order to establish a prima facie violation of the ADA, Evarts must show that 1) he is a qualified individual with a disability; 2) Quinnipiac is an entity subject to the act; and 3) he was denied the opportunity to participate in or benefit from Quinnipiac's services, programs, or activities or Quinnipiac otherwise discriminated against him by reason of his disability.  *See, e.g, Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  Evarts satisfies the first two elements because Quinnipiac does not dispute that Evarts suffered medical problems covered by the statute; and Quinnipiac does not contest that the ADA applies to it.  However, Quinnipiac asserts that the third requisite element of the ADA  is not present: *i.e.*, Quinnipiac has not discriminated against Evarts based on his disability.

**1.     Quinnipiac's Argument in Favor of Summary Judgment on the ADA Claim**

Quinnipiac states that Plaintiff's ADA claim appears to be two-pronged.  Doc. 33-1, at 20. In particular, he "takes issue with the directive sending him home on January 24, 2014, categorizing QU's actions as a failure to 'afford [him a] reasonable accommodation . . . when requested,' a claim undone by the contemporaneous doctor's note deeming him unable to work until further notice." *Id.* Second, Plaintiff contends that "he 'was refused to return to work even after [his] surgeon released him for duty.'" *Id.,* at 21.  According to Quinnipiac, Evarts based this belief that "Dr. Tomak's April 24, 2014 note releasing him to sedentary work as of May 5, 2014 compelled QU to immediately

restore him to his position as a public safety officer." *Id*. Quinnipiac concludes that whether he seeks to pursue this ADA claim as a "failure to accommodate" or a "discriminatory adverse action under the ADA," the claim fails, as a matter of law. An employee who is designated as unable to work cannot sustain a "failure to accommodate" claim. Moreover, a delay in restoration is not actionable absent evidence that it was motivated by a discriminatory intent. Doc. 33-1, at 21. Here, Plaintiff has presented no evidence of discriminatory animus.

### a. Failure to Accommodate

Plaintiff's ADA claim alleges that he was "not afforded a reasonable accommodation" from Quinnipiac when he requested a gate assignment that did not require him to direct traffic and instead was sent home on January 24, 2014, until he produced a medical note identifying any applicable restrictions. Doc. 1, ¶¶ 6-7. Before addressing Quinnipiac's arguments for summary judgment on the "failure to accommodate" theory, the Court notes that under Second Circuit authority, "[a] plaintiff states a prima facie failure to accommodate claim by demonstrating that[:]

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009)).

As stated in the regulations regarding the ADA, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could

34

overcome those limitations." 29 C.F.R. § 1630.2(o)(3).  *See also Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.").  The court looks at whether the failure to provide a proposed accommodation constitutes a violation of the ADA.

First, "the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions." *Jackan*, 205 F.3d at 566 (quoting *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir.1995)). "If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan*, 205 F.3d at 566 (quoting *Borkowski*, 63 F.3d at 138).

In the case at bar, Quinnipiac points out that on January 23, 2014, Plaintiff sent a detailed email to Assistant Chief Cotto, which catalogued his physical symptoms that made it impossible for him to direct traffic at Gate 1 so he requested to be moved to Gate 2.  Doc. 33-2, at 54  (Evarts Dep, Ex. I).  The facts show that prior to his January 23 request to be moved to Gate 2, his work file stated that he could work without restrictions.  *See* Doc. 33-4 (Lambusta Aff.), ¶¶ 4-5, Ex. 3; Evarts Dep., at 119-20.  Specifically, the report of the Connecticut Orthopaedic Specialists,  dated  December 12, 2013, in his work file showed that he had a diagnosis of "Lt Shld/Lt Elbow" but also that he  may "continue work without restrictions."  Doc. 33-4, at 15 (Ex. 3).  Lambusta of Quinnipiac's HR Department thus followed Quinnipiac's standard policy of "requir[ing] medical documentation for requests for restrictions, light duty or other accommodations."  *Id.*, ¶ 5.  That is when Plaintiff followed up by emailing to Lambusta a letter from Dr. Bloomgarden which stated that he was

"unable to return to work . . . until further notice." Doc. 33-2, at 58 ( Evarts Dep., Ex. J).

As Quinnipiac details, prior to his January 23 request, Plaintiff had previously worked at Gate 1, an assignment in which directing traffic might arise, on January 10, 11, 16, 17, 20, and 21, 2014. Doc. 33-4 (Lambusta Aff.) ¶ 4, Ex. 2. However, once Plaintiff sent the email to Cotto stating that he was incapable of directing traffic, Quinnipiac assigned him in the interim to Gate 3, while its Human Resources Department made the appropriate interactive request that Plaintiff update his medical documentation to substantiate his restrictions and to identify their extent so that any necessary work modifications could be considered and implemented.[26] Doc. 33-5 & 40-18, ¶ 10; Doc. 33-2, at ¶ 54-55 ( Evarts Dep., Ex. I, J). That very same day, Plaintiff's doctor, Bloomgarden, provided the note that plainly stated that Plaintiff is "unable to return to work" and this "restriction will be in effect till further notice." Doc. 33-2, at 58 ( Evarts Dep., Ex. J ). At that point, recognizing that Plaintiff would be absent for more than three consecutive days with continuing care by a physician, Quinnipiac states that it decided to place Plaintiff on FMLA leave. *See* 29 C.F.R. § 825.114(a)(2)(i). Reassigning Plaintiff to another position would have contravened Dr. Bloomgarden's note.

Quinnipiac asserts that Plaintiff cannot meet the burden of showing that a proposed accommodation was reasonable when the evidence he provided of his disability, the note from Dr.

---

[26] As Quinnipiac asserts:

Given that QU had on file recent medical documentation clearing plaintiff to work "regular duty" with no specified restrictions, defendant was certainly well within its rights to request updated medical documentation substantiating plaintiff's request to be relieved of any assignment involving traffic directing responsibilities because his 'right knee and shoulder are giving out.'" (Evarts Dep., Exh. I).

Doc. 33-1, at 22.

Bloomgarden, stated that he was unable to work at all until further notice. Quinnipiac thus argues that under such undisputed facts, Plaintiff's "failure to accommodate" claim under the ADA fails as a matter of law.

In support, Quinnipiac presents the following case law. When an employee is "totally disabled and unable to perform any work," he is "unqualified for a position." *Montague v. Sodexco, Inc.*, No. 3:15-cv-00972, 2017 WL 4476969, at *10 (D. Conn. Oct. 6, 2017). *See also Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 561 (2d Cir. 2009) (in light of plaintiff's doctor's report that plaintiff was "totally incapable of performing his job" for the "foreseeable future," employer did not violate ADA by denying plaintiff's requested accommodation). Plaintiff cannot establish that his requested accommodation would have enabled him to perform the essential functions of his job and "would allow him to do so at or around the time at which it is sought." *Graves*, 353 F. App'x at 560. At the time the accommodation was sought, Plaintiff was medically documented as unable to work. Quinnipiac concludes that summary judgment should be rendered on Plaintiff's ADA reasonable accommodation claim.[27]

### b. <u>Delay in Allowing Plaintiff to Return to Work</u>

Alternatively, Plaintiff argues that Quinnipiac violated the ADA by creating an eight-week lag in time between Dr. Tomak's note releasing him to "sedentary" work and Plaintiff's restoration to his employment. Quinnipiac counters, stating that it had a reasonable explanation for the delay:

---

[27] Quinnipiac asserts that to the extent that Plaintiff describes the delay in his reinstatement as a failure to accommodate, he neglects to take into account that Quinnipiac continued to provide him with an interim leave of absence after his FMLA leave expired. By the time of his release in May of 2014, regardless of which proffered start date one used to calculate the leave – January 27 or March 18, 2014 – Plaintiff's entitlement to FMLA leave had ended. Quinnipiac placed Plaintiff on personal leave until his doctors finally certified that he was physically able to return to his prior post.

the need to obtain all medical documentation that Plaintiff was fit to return to work. Moreover, there is no evidence that Plaintiff's legitimate business reason for the delay was mere pretext and instead motivated by discriminatory animus.

"To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)). Also, "ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the [United States] Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973): A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista,* 445 F.3d at 169 (lateral citation omitted).

Quinnipiac states that when Plaintiff was cleared to return to "sedentary" work as of May 5, 2014, by spinal surgeon Dr. Tomak, he believed that such clearance alone entitled him to return to Quinnipiac in a desk assignment on the North Haven campus, the same position in which he worked prior to his leave. Evarts Dep., at 193. However, Quinnipiac asserts that such a return was not possible until Quinnipiac received "clarification as to the full extent of [Plaintiff's] job restrictions." Doc. 33-3 (Musante Aff.,), ¶ 6. Musante, Quinnipiac's then "Human Resources Business Partner," sought clarification as to Dr. Tomak's use of the term "sedentary" because "the term does not lend

itself to a uniform definition when applied in the workplace."[28] *Id*. She thus inquired of staff at Dr. Tomak's office regarding the meaning of "sedentary" with respect to Evarts's position, but did not receive this clarification from Dr. Tomak until June 16, 2014. Doc. 33-3 (Musante Aff.), ¶¶ 6-7; Doc. 33-2, at 69 (Evarts Dep., Ex. S). The note specified that Evarts could "return back to his medical school position." Doc. 33-2, at 69 (Evarts Dep., Ex. S).

In the meantime, because Plaintiff had been deemed disabled by multiple doctors due to various ailments (*e.g.*, back, shoulder, knee), Musante informed Plaintiff that he must be released by all of his doctors before he could return to work. Evarts Dep., at 168. Plaintiff complied by supplementing his release from Dr. Tomak with a note from Dr. Cohen, his shoulder doctor, dated June 3, 2014, and a note from Dr. McCallum, his knee doctor, dated June 18, 2014. Doc. 33-2, at 58, 73 (Evarts Dep., Ex. R, U). Within ten days following the last release and on the same day originally projected in the FMLA certification by Dr. Tomak, Plaintiff returned to work. *Id.*, at 59 (Evarts Dep., Ex. K).

Upon the facts presented, Quinnipiac concludes that there is no indication that it subjected Plaintiff to an "adverse employment action" based on his disability. Within this Circuit, an employer's requirement that an employee provide medical documentation of the state of his condition is not viewed as an "adverse employment action." *See, e.g., Boughton v. Town of Bethlehem*, No. 1:13-cv-01583, 2015 WL 5306077, at *9 (N.D.N.Y. Sept. 10, 2015)(no adverse action where

---

[28] Musante also notes that she had received conflicting notes from Plaintiff's medical doctors at this time. On the same date she received a "Return to Work" note from Dr. Tomak, dated April 28, 2014, indicating that Plaintiff could return to "sedentary work" on May 5, 2014, she also received a note from Dr. David Cohen, dated March 10, 2014, releasing Evarts to return to "a sedentary work position" as of March 11, 2014. Doc. 33-1, at 65-66 ( Evarts Dep., Ex. O & P). Plaintiff, however, had been scheduled for surgery on March 18, 2014, so this note engendered confusion, requiring Musante to determine Evarts's true state of health on April 29, 2014.

plaintiff placed on "no-pay status while Defendant awaited further medical documentation detailing Plaintiff's limitations"); *Gentile v. Potter*, 509 F. Supp. 2d 221, 240-41 (E.D.N.Y. 2007) ("Requiring an employee to provide medical documentation is not a materially adverse action."); *Reckard v. Cty. of Westchester*, 351 F. Supp. 2d 157, 161 (S.D.N.Y. 2004) (requirement that plaintiff provide updated medical documentation regarding her condition was not an adverse employment action).

Furthermore, even if Quinnipiac's delay were found to constitute an "adverse employment action," Quinnipiac argues that "there is no proof that the delayed reinstatement was due to his disability." Doc. 33-1, at 26. To state a prima facie ADA claim, one must present facts to create an inference that there was discrimination due to a plaintiff's disabilities. *See, e.g.*, *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) ("[I]t is axiomatic that the adverse employment action must take place under circumstances giving rise to an inference of discrimination in order to be actionable under the ADA."); *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015) ("To succeed on a claim that an employer has constructively denied the employee's request for a reasonable accommodation through delay 'courts in the Second Circuit have consistently held that a plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence.'") (quoting *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014)(collecting cases)).

In the case at bar, Quinnipiac states that the evidence adduced during discovery shows that the delay in Plaintiff's reinstatement was due to Quinnipiac's perceived need to obtain appropriate documentation from Plaintiff's physicians to tailor a proper position for his return. *See* Doc. 33-2, at 63 ("Employee Statement of Understanding," requiring employee to "provide certification from a health care provider" that he is "medically able to resume work" before returning to work from

FMLA leave).  Given conflicting medical notes in his file and no clear definition of "sedentary," Quinnipiac acted in a legitimate, reasonable fashion to  "reconcile plaintiff's restriction to 'sedentary' work with his job functions as a public safety officer."  Doc. 33-1, at 24.  Quinnipiac asserts that the record presented provides no evidence that Quinnipiac's delay resulted from animus  related to any of Plaintiff's disabilities.

Under the ADA, employing the *McDonnell-Douglas* test, an employee must prove that an adverse action taken against him was motivated at least in part by a discriminatory reason.  *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).  The plaintiff may prove discrimination indirectly, showing that the employer's stated reason of its action was pretextual or by presenting a "mosaic" or "bits and pieces of evidence," which together add up to an inference of discrimination.  *Id.*

Here, Quinnipiac argues that Plaintiff has presented neither direct nor circumstantial evidence of discrimination.  Nor does he offer evidence that Quinnipiac's stated reason for delay was a pretext for unlawful discrimination.  Doc. 33-1, at 28.  Plaintiff has thus presented no "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  Quinnipiac also states that there is no evidence of  "departures from procedural regularity" or "shifting explanations, or statistics" to suggest that discrimination occurred.   *Id.* (quoting *Nicholson v. Bd. of Trustees for the Connecticut State University System*, No. 3:08-cv-1250, 2011 WL 4072685, at *8 (D. Conn. Sept. 12, 2011)).  In sum, Quinnipiac concludes that Plaintiff cannot show that its reason to return him to his position on June 28, 2014 was "pretext masking an unlawful discriminatory motivation." Doc. 33-2, at 27.

## 2.     Plaintiff's Argument in Opposition to Summary Judgment on His ADA Claim

Plaintiff counters, arguing that he was initially afforded reasonable accommodations under the ADA when he requested them, but on January 24, 2014, was "swiftly sent home, rather than allowing him to continue working with the accommodation." Doc. 40-1, at 15.  Plaintiff claims that it was unreasonable for Quinnipiac to send him home on January 24, 2014, "especially in light of the fact that it had already found a position for the Plaintiff that accommodated his requests." *Id.*, at 17-18.   In addition, Plaintiff asserts that "Defendant has always been on notice of the fact that Plaintiff requires some accommodations because [he] was hired with a disability." *Id.*, at 18 (citing Evarts Dep., at 148, 219).  He thus claims that Quinnipiac violated his rights under the ADA by failing to make reasonable accommodations for him in January 2014.  Doc. 40-1, at 16-17.

As a second argument in support of an alleged ADA violation, Plaintiff asserts that Quinnipiac discriminated against him based on his disability by not allowing him to come back to work in a timely manner.  He points out that "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Id.*, at 21 (citing *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 639 (2d Cir. 2000)). Such a "materially adverse change . . . might be indicated by  a termination of employment, a demotion evidenced by a decrease in wage or salary,…a material loss of benefits, significantly diminished material responsibilities, or other indices…unique to a particular situation." *Id.*, at 21-22  (quoting *Patrolmen's Benevolent Ass'n of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002) (internal quotation marks omitted)).  Plaintiff believes that he "undoubtedly suffered an adverse employment action" when "he was denied the chance to return to work." Doc. 40-1, at 23.  Plaintiff complains that "[e]ven though the Plaintiff had submitted a note from Dr. Cohen, dated March 10,

2014, stating that [he] could return to work as of March 11, 2014," Quinnipiac "required the Plaintiff to get another note from Dr. McCallum regarding his knee" and "a supplemental note from Dr. Cohen dated June 3, 2014, with the box checked 'continue with previous restrictions.'" *Id.*, at 23. Also, after obtaining a note from Dr. Tomak that he could return to "sedentary" work on May 5, 2014, he was required to obtain a second note dated June 9, 2014, stating that he "could return to his medical school desk job," which Dr. Tomak "presumably understood that position to be sedentary." *Id.*

In Plaintiff's opinion, he "was made to jump through hoops to get back to work, while his paid time off had run out, to the Plaintiff's financial detriment." *Id.* He states that his "paid time off did not last through the entirety of his leave of absence" so that he "stopped receiving checks from the Defendant sometime in April of 2014." *Id.,* at 23-24. He also points out that there was a delay in the processing of his workers' compensation claim because the "carrier deemed accountability for his claim on June 24, 2014," and "a representative processed payment to the Plaintiff for all of his lost time from January 24, 2014 to May 6, 2014." *Id.*, at 24. He thus only received money from this claim "days before his return to work."[29] *Id.* Plaintiff deems not being compensated by Quinnipiac afer mid-April 2014 to be "a materially adverse employment action." *Id.*

With respect to proving discrimination, Plaintiff states that his "prima facie burden is . . . de minimis" and that he need only prove an "adverse employment action against him under circumstances giving rise to an inference of discrimination." *Id.* He argues that summary judgment must only be granted with caution in an employment discrimination case "when the employer's intent

---

[29] With respect to monies received, Plaintiff points out that he was not "compensated via his civil action settlement against Mangakleen [sic]. . . until sometime after October of 2015." Doc. 40-1, at 24.

is in question." *Id.* (quoting *Flieger v. E. Suffolk BOCES,* 693 F. App'x 14, 17 (2d Cir. 2017)). Plaintiff concludes that he has put forth enough evidence to show that the Defendant's delay in reinstating him was under circumstances giving rise to an inference of discriminatory intent." *Id.*, at 25.

With respect to the *McDonnell Douglas* test, he states that "there is a genuine issue of material fact whether Defendant's decision to delay the Plaintiff's reinstatement was motivated by discriminatory intent." *Id.*, at 27. He argues that "Defendant had all the information it needed at least as of June 8, 2014 to allow the Plaintiff to return to work." He surmises that "[t]here was no legitimate reason for the Defendant to delay the Plaintiff's return to work any longer" so "the only plausible explanation was that there was a discriminatory animus behind the Defendant's actions." *Id.*

### 3. **Analysis**

Examining the two bases for his ADA claim, Quinnipiac's designated dates for his FMLA leave and alleged delay in effecting his reinstatement, the Court finds that there is no genuine dispute regarding the material facts and Quinnipiac is entitled to judgment as a matter of law.

First, as to Plaintiff's argument that he had repeatedly received accommodations in the past without an inquiry into his restrictions, the Court finds that the facts indisputably show that his situation changed in late January of 2014.[30] Plaintiff went from having no documented restrictions

---

[30] Nicole Lambusta of Quinnipiac's HR Department, testified in her affidavit that "Ellsworth Evarts was injured at work in June 2013. After a brief absence, Mr. Evarts returned to work on 'regular duty' per a medical note issued by Yale-New Haven Hospital Occupational Health." Doc. 33-4 (Lambusta Aff.), ¶ 3. Therefore, at the time he requested transfer to Gate 3, there were no formal restrictions in Evarts's file. Also, as shown in Quinnipiac's files, he had previously worked at Gate 1, "a post that involved directing traffic, on January 10, 11, 16, 17, 20, and 21, 2014 ." *Id.*, ¶ 4.

to formally requesting, by email to Cotto, a change in his gate assignment due to his escalating knee problems.  Once Quinnipiac requested a medical note to make a formal change in his position, it received the Bloomgarden note stating that Plaintiff was "unable to work" until further notice.  At that point, with Plaintiff "unable to work" and also under the care of treating physician Bloomgarden for more than three consecutive days, Quinnipiac reasonably commenced an FMLA-mandated leave for Plaintiff.  According to Plaintiff, he was at  risk of injuring himself further due to his medically documented inability to work.  Evarts Dep., at 125 ("I was having difficulty and my knee was giving out; [Doctor Bloomgarden] didn't want me to take a fall and do more damage to my neck and my cervical spine.").  Placing Plaintiff on FMLA leave at that time was neither an adverse action nor a proven act of discrimination. It was a statutorily mandated act of protection.[31]

As to his June 28, 2014, return date to work, it is clear that Plaintiff was dissatisfied with Quinnipiac's proffered reason for the delay in reinstating him to his position: the need to have full medical clearance for his return and to clarify his restrictions to make a position that would accommodate them.[32]  Plaintiff  wanted to return to work pursuant to Dr. Tomak's first note, dated

---

[31]    It would defy logic to fault an employer for complying with the medical documentation the employee himself procured to prove his physical restrictions.  An employer cannot responsibly assign an employee to an alternative position when his own doctor has written that the employee is unable to work till further notice.  An "appropriate vacancy" cannot by definition include a position where an employee is medically "unable to work."

[32]   As summarized by Quinnipiac in its reply brief:

"[There was a] request that plaintiff provide medical notes from each of his physicians as a condition to reinstatement. In an effort to manipulate the record and bolster his claim that the delay was unnecessarily long, plaintiff suggests that as of Ms. Musante's phone call with Dr. Tomak's nurse, QU had all the information it needed to permit plaintiff to return to work. But on that call, Ms. Musante was advised that a further update was forthcoming after plaintiff's June 9 visit (Musante Aff. [Doc. No. 33-3] ¶ 7), an update that was not received until June 16. (Musante

April 28, 2014, rather than wait for Quinnipiac to explore the parameters of the term "sedentary work" with Tomak and/or clear up the status of his condition with his other doctors, Cohen and McCallum. Doc. 40-1, at 23. However, the fact that Plaintiff disagrees with Quinnipiac's judgment in taking these additional measures does not render them unreasonable or implausible. Moreover, even if Quinnipiac's delay in reinstating Plaintiff was not optimal or satisfactory to Plaintiff, that does not mean it stemmed from discrimination due to his disability. After all, assuming *arguendo* Plaintiff is correct that prior to his injuries from his June 2013 fall Quinnipiac employed him as a security guard with limited abilities, that shows a tendency to accommodate physical disabilities, not discriminate against them. Moreover, when Plaintiff was finally reinstated in June of 2014, Quinnipiac restored him to his security guard position, tailoring that position to specifically comport with his new injury-related restrictions.[33] Such actions contradict charges of "discriminatory

---

Aff. [Doc. No. 33-3] ¶ 9; Evarts Dep., Ex. S). Furthermore, QU had yet to receive a note from Dr. McCallum or an updated note from Dr. Cohen, who most recently had signed a note releasing plaintiff to return to work on March 11, 2014, a few days before his back surgery and subsequent extended period of convalescence. Doc. No. 33-3 (Musante Aff.), ¶ 10,

Doc. 41, at 9.

Under these circumstances, Quinnipiac concluded that there was a need to clarify the scope and extent of Plaintiff's restrictions before returning him to work. The Court further notes that Plaintiff asserts that Quinnipiac had "all information it needed at least as of June 8, 2014." Doc. 40-1, at 27. Plaintiff's own doctor, Tomak, provided on his FMLA certification that Evarts would be unable to work until he was evaluated twelve weeks after his March 18 surgery, approximately June 18, 2014. Evarts Dep., Ex. K. "On or after June 18, 2014, [Musante of Quinnipiac's HR Department] received a note dated June 18 from Dr. McCallum documenting the following restrictions: no gate duty, limited walking, and sedentary work until [Plaintiff was seen in two weeks for a follow-up appointment." Doc. 33-3 (Musante Aff.), ¶ 10; Evarts Dep., Ex. U. Plaintiff returned to work on June 28, 2014. Doc. 33-3 (Musante Aff.), ¶ 12.

[33] Musante testified that Quinnipiac "fashioned a unique job for plaintiff that met all of his medical restrictions." Doc. 33-3 (Musante Aff.), ¶ 12. Other public safety officers are made to

animus" by Quinnipiac, either direct or circumstantial in nature.[34]

Under the *McDonnell Douglas* test, once an employer provides a reasonable business reason for its behavior, the plaintiff must show that the reason is pretextual by pointing to evidence from which a reasonable jury could find discriminatory motive. The Second Circuit has yet to address the proper standard for finding discrimination in light of the United States Supreme Court's holdings in cases arising under similar federal discrimination statutes. *See Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177-78 (2009) (holding that an ADEA disparate-treatment plaintiff "must prove by a preponderance of the evidence . . .. that age was the 'but-for' cause of the challenged employer decision.") *and Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 362 (2013) (holding that plaintiff in a Title VII retaliation case must establish "that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). *See also Forrester v. Prison Health Servs., Inc.*, 651 F. App'x 27, 28–29 (2d Cir. 2016) ("We need not decide whether Forrester may proceed under a mixed-motive theory [on her ADA claim], as we find her claims fail regardless of the causation standard applied."): *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 (2d Cir. 2014) (This "but-for" standard [of *Nassar*] might also apply to her ADA retaliation claim. . . . We need not decide that question, however, or even apply 'but for' causation because plaintiff fails to satisfy the more lenient "motivating factor" standard.").

Here, the Court need not determine the appropriate causation standard for ADA

---

"rotate to some extent or another among various posts," but Plaintiff was assigned exclusively to the desk at the North Haven campus. *Id.*

[34] The record supports Quinnipiac's statements of its legitimate, nondiscriminatory reason it delayed in restoring Plaintiff to his position. In contrast, Plaintiff has failed to produce evidence to suggest that Quinnipiac's nondiscriminatory reason is untrue.

discrimination claims. Whether the Court applies the "but for" standard referenced above or the "motivating factor" [or mixed motive] test of *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000), plaintiff has failed to present evidence of pretext. Specifically, he has failed to point to facts to prove that Quinnipiac's delay in reinstating him was the product of discrimination due to his disability.

To defeat a motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586. (1986). Rather, he must "come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely ... on the basis of conjecture and surmise." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir.1992). To oppose summary judgment, a party "may not rest on the pleadings, but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996).

"Throughout this analysis, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 256 (S.D.N.Y. 2009)(quoting *Rambacher v. Bemus Point Cent. Sch. Dist.*, 307 F. App'x 541, 543 (2d Cir. 2009)). "'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient." *Cameron v. Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)). Summary judgment "is appropriate in discrimination cases where a plaintiff's argument is based on conclusory allegations of discrimination and the employer provides

a legitimate rationale for its conduct." *Chasse v. Computer Scis. Corp.*, 453 F. Supp. 2d 503, 514 (D. Conn. 2006) (citation and internal quotation marks omitted).

In the case at bar, Plaintiff merely states that Quinnipiac's discriminatory intent may be inferred from the facts that Plaintiff is disabled and was not reinstated to his position in May 2014. Doc. 40-1, at 27 ("There was no legitimate reason for the Defendant to delay the Plaintiff's return to work any longer, and the only plausible explanation was that there was a discriminatory animus behind the Defendant's actions."). However, a plaintiff cannot prove that an employer's stated reason for its conduct is pretextual simply by pointing to his inclusion in a protected class. *See, e.g.*, *Zito v. Fried, Frank, Harris, Shriver & Jacobson*, LLP, 869 F. Supp. 2d 378, 394 (S.D.N.Y. 2012) (facts that plaintiff was terminated and a member of protected classes (gender and age), "standing alone" were found inadequate to support discrimination claims); *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 885 (N.D.N.Y. 1996) ("Needless to say, the facts that plaintiff is disabled and that Prudential fired her is insufficient to raise an inference of discrimination."). Rather, the Plaintiff has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that his employer's adverse actions occurred under circumstances giving rise to an inference of discrimination. At the very least, Plaintiff must "show that discrimination was 'at least one of the motivating factors' in the employer's decision." *Primmer*, 667 F. Supp. 2d at 256 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).[35]

---

[35] Furthermore, an ADA plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177-78 (D. Conn. 2015) (*quoting Bombero v. Warner–Lambert Co.*, 142 F.Supp.2d 196, 203 n. 7 (D. Conn. 2000). However, Evarts has proffered no such evidence in this case.

Moreover, delay alone is insufficient to raise an inference of discriminatory intent. *See, e.g.*, *Saunders v. Queensborough Cmty. Coll.*, No. 13 CV 5617 (PKC) (RML), 2015 WL 5655719, at *7 (E.D.N.Y. Sept. 24, 2015) ("At best, Plaintiff's allegations may suggest negligence or incompetence, but they are insufficient to plead an inference of discriminatory intent."). One cannot, therefore, simply make the conclusory allegation that one's employer must have taken an adverse action simply because of one's disabilities. There must be some evidentiary basis for the Court to make such an inference. In particular, on summary judgment, it is incumbent on the Plaintiff to show some evidence of discriminatory animus. Here, he has presented no such evidence.[36]

Absent facts to support a finding of discriminatory animus, summary judgment must enter for the defendant on an ADA claim. *See, e.g., Clark v. Jewish Childcare Ass'n, Inc.,* 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015) (granting summary judgment on failure to accommodate claim where lag in granting disability leave was due to employee's delay in providing requested medical documentation); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir. 2006) ("Because *Sista* can point to no evidence from which a reasonable jury could conclude that he was terminated on account of his mental illness rather than his past behavior, we conclude that the District Court did not err in granting summary judgment and dismissing Sista's ADA claims.").

In the case at bar, Plaintiff offers no probative evidence, direct or circumstantial, that Defendant Quinnipiac, his employer, discriminated against him due to his disabilities. Defendant is accordingly entitled to summary judgment dismissing Plaintiff's ADA claim.

---

[36] Plaintiff remains employed as a security guard by Quinnipiac, which also militates against a finding that Quinnipiac discriminates against him as one who has a disability which substantially limits a major life activity. *See, e.g., Roberts v. New York State Dep't of Corr. Servs.*, 63 F. Supp. 2d 272, 288 (W.D.N.Y. 1999).

# V.  CONCLUSION

The record in this case shows that Plaintiff Evarts suffered a serious accidental injury which, through no fault of his own, has left him with permanent pain and disability.  Plaintiff's quality of life has been adversely affected.  His distress at that condition is fully understandable in human terms.  One can only sympathize with Mr. Evarts.

This case turns upon established principles of law.  While Plaintiff has recovered some compensation and allowances for his injury from several sources, including Defendant Quinnipiac, he contends in this lawsuit that Quinnipiac owes him additional amounts.  Evarts bases that contention upon two federal civil rights statutes: the FMLA and the ADA.  Plaintiff asserts a claim against Quinnipiac under each of these statutes.  To succeed on those claims, Evarts must prove that Quinnipiac violated the statute in question and owes him certain sums in consequence.

There has been extensive pre-trial discovery.  Evarts was deposed.  Other witnesses submitted affidavits based on personal knowledge.  Many contemporaneous documents were produced.  Defendant now moves for summary judgment dismissing Plaintiff's claims.  To decide that motion, this Court must consider the evidentiary record in the light of the procedural Rule and the governing decisions of the Supreme Court and the Court of Appeals, including those cited in this opinion.

Defendant's motion for summary judgment is made under Rule 56 of the Federal Rules of Civil Procedure.  Rule 56(a) provides: "The court shall grant summary judgment if the movant [here, Defendant Quinnipiac] shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(c)(1) specifies the manner in which "a party" [Defendant or Plaintiff] "must support the assertion" that "a fact cannot be or is genuinely disputed."

For the reasons stated in this Ruling, the Court concludes that with respect to each of Plaintiff's statutory claims, FMLA and ADA, there is no genuine issue as to any material fact, and Defendant Quinnipiac is entitled to judgment as a matter of law dismissing both claims.

Therefore, the Court GRANTS Defendant's "Motion for Summary Judgment" [Doc. 33] in its entirety, and GRANTS DEFENDANT JUDGMENT on both the FMLA and ADA claims. The case is hereby DISMISSED. The Clerk is directed to close the file.

It is SO ORDERED.

Signed: New Haven, Connecticut
October 4, 2018

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge